Filed 9/15/22

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PATRICIA FLORES et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF SAN DIEGO, <br><br> Defendant and Respondent. | D078501 <br><br><br> (Super. Ct. No. 37-2017-00049108-CU-PA-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Randa Trapp, Judge. Reversed and remanded for further proceedings.

Denning Moores, Christina M. Denning and Brian M. Cook for Plaintiffs and Appellants.

Mara W. Elliott, City Attorney, George F. Schaefer, Assistant City Attorney, and Stacy J. Plotkin-Wolff, Deputy City Attorney, for Defendant and Respondent.

I.

INTRODUCTION

Appellants Patricia Flores and Angelica Sanchez appeal from a judgment entered after the trial court granted summary judgment in favor defendant City of San Diego (the City).

Flores and Sanchez sued the City for wrongful death and negligence, respectively, in connection with the death of William Flores, who was operating a motorcycle that was the subject of a police vehicle pursuit when he crashed and was killed.[1] The City moved for summary judgment on the ground that it is immune from liability under the grant of immunity provided for in Vehicle Code section 17004.7 (section 17004.7). Section 17004.7 grants immunity to an agency, shielding the agency from liability for collisions involving vehicles being pursued by peace officers, if the agency "adopts and promulgates a written policy on, and provides regular and periodic training on an annual basis for, vehicular pursuits . . . ." (§ 17004.7(b)(1); see *Ramirez v. City of Gardena* (2018) 5 Cal.5th 995, 997 (*Ramirez*).)

On appeal, appellants contend that the trial court erred in granting summary judgment, arguing that a number of the court's legal conclusions are erroneous and that the court failed to acknowledge that there remain material facts in dispute as to whether the City is entitled to immunity under section 17004.7. Specifically, appellants raise the following contentions: (1) The trial court failed to apply California Code of Regulations, title 11, section 1081, which includes certain standards that govern the required training on vehicle pursuits, including an annual one-hour minimum time

---

[1] William Flores was Flores's son and Sanchez's boyfriend. Although Flores and Sanchez originally filed separate actions, the two actions were consolidated in the trial court.

requirement; (2) A triable issue of material fact remains as to how many SDPD officers actually watched the vehicle pursuit training video in full, and this unresolved factual question means that the court could not conclude that the City met the training requirement set out in section 17004.7; (3) The trial court failed to consider that the City's vehicle pursuit policy "is defective as a matter of law" because the policy did not, "include[ ] a provision stating, '[s]upervisory responsibility shall include management and control of a pursuit' "; (4) The trial court erred by "not continuing the hearing or denying the motion for summary judgment because facts essential to justify opposition to the motion may exist but could not be obtained because of the City's refusal to produce [certain] evidence" (some capitalization omitted); (5) To the extent the trial court relied on Government Code section 815.2 in ruling on the motion for summary judgment, the court erred; and (6) Under the authority of *Ramirez, supra*, 5 Cal.5th 995, the trial court was required to determine that the City had "meaningfully implement[ed]" its pursuit policy before concluding that the City was entitled to immunity under section 17004.7, but the court failed to address this issue and therefore erred in ruling that immunity applied.

We conclude that the vehicle pursuit policy training required by section 17004.7 must meet certain basic standards that are set forth in California Code of Regulations, title 11, section 1081,[2] as adopted by the Commission on Peace Officer Standards and Training (the POST Commission), including the annual one-hour minimum time standard set out in that regulation, before a governmental entity is entitled to immunity under the statute. Not only did the City fail to present undisputed evidence that the training it provided in

---

[2]    Subsequent references to Title 11 of the California Code of Regulations shall be cited in text as "Regulation" followed by the section number.

3

the year prior to the incident at issue met the annual one-hour standard, but the City failed to dispute the fact, put forth by appellants, that the training implemented by the City comprised a single video of less than half the required one-hour duration.

In the absence of training that met the standards imposed by Regulation 1081, as required by section 17004.7, the City is not entitled to immunity under that statute, as a matter of law.[3]  Summary judgment in favor of the City was therefore erroneously granted, and the judgment must be reversed.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.  *Factual background*

1.  *The vehicle pursuit*

At approximately 9:30 a.m. on March 26, 2017, a San Diego Police Department (SDPD) officer was monitoring an intersection in the City of San Diego because the SDPD had received citizen complaints of speeding motorists in the area.  While stopped at a red light in a marked patrol car, the officer observed a motorcycle traveling southbound on Murray Ridge Road and approaching a light that was cycling from green to red.  The motorcyclist accelerated through the light after it turned red.

The officer turned to follow the motorcycle with the intention of pulling the driver over.  The officer activated his emergency lights and siren. However, the motorcyclist did not pull over, and instead accelerated to a speed of 50 miles per hour in a 35 miles per hour speed zone.  The officer

---

[3]    Given our conclusion that the City has not demonstrated its entitlement to section 17004.7 immunity, we need not consider appellants' alternative arguments challenging the court's summary judgment ruling.

advised a dispatcher that the motorcyclist was attempting to evade the officer and was traveling southbound on Murray Ridge Road.

The officer continued to pursue the motorcyclist, who eventually merged onto southbound Interstate 805 and accelerated to over 100 miles per hour.  The officer apprised a dispatcher of his location, the level of traffic on the freeway, and the speed of the motorcycle.

The officer momentarily lost sight of the motorcyclist, but then observed him again and continued the pursuit.  After losing sight of the motorcyclist a second time, the officer terminated the pursuit.  The officer did not notify a dispatcher that he had terminated the pursuit because he was responding to a competing high priority radio call regarding a knife threat.

In the meantime, a second SDPD officer had been waiting along the side of Interstate 805 for the pursuit to reach his location.  The second officer observed a motorcycle in the number one lane that appeared to be traveling at a high rate of speed.  The officer entered the freeway, moved into the number three lane and activated his emergency lights.  The motorcyclist slowed down and pulled alongside the officer on the driver's side of the police vehicle.  The officer saw that the driver of the motorcycle was a male, and that he had a female passenger on the motorcycle with him.  Both the driver and the passenger looked at the officer, who motioned for them to pull over.  Instead of pulling over, the driver of the motorcycle proceeded to flee.

At some point the motorcyclist exited the freeway.  The second pursuing officer observed the motorcyclist proceed through a red light.  Although the officer continued to pursue the motorcyclist, the motorcyclist was able to increase the distance between the motorcycle and the officer by more than two blocks.  The officer advised a dispatcher that the motorcyclist was headed eastbound on Plaza Boulevard.  A few seconds later, the

5

motorcyclist swerved left into a Firestone Tire Store parking lot and lost control of the motorcycle. The passenger was thrown from the motorcycle, and the motorcyclist crashed the motorcycle into a retaining wall. The motorcyclist was determined to be William Flores; he died at the scene.

2. *Evidence regarding the City's vehicle pursuit policy and training*

Shelley Zimmerman was Chief of Police for the SDPD from March 2014 until March 2018. In that role, she oversaw the policies and procedures of the SDPD and routinely discussed police pursuits with her assistant chiefs. In 2016, Chief Zimmerman reviewed and adopted the SDPD Policy Manual, which included Department Policy 1.03 entitled "Pursuit Policy." Policy 1.03 refers SDPD officers to SDPD Pursuit Procedure 1.03. Also in 2016, SDPD Pursuit Procedure 1.03 ("Pursuit Procedure") was amended. Chief Zimmerman agreed with the 2016 changes to the Pursuit Procedure and her Executive Assistant Chief, David Ramirez, approved the changes on her behalf.

At the time of the pursuit at issue in this case, the SDPD written policy for preserving safety during vehicle pursuits included specific guidelines from the Commission on Peace Officers Standards and Training (POST commission) governing (a) when to initiate pursuits, including the factors to consider when deciding to initiate a pursuit; (b) the number of pursuing vehicles that may be involved; (c) when and how to use air support; (d) communications and coordination procedures; (e) supervisors' roles and inter-jurisdictional considerations; (f) driving tactics; and (g) the factors to consider in deciding whether to continue or terminate a pursuit. The written vehicle pursuit policy also required officers to read the policy and certify that they had received, read and understood the policy.

6

Since 2014 or 2015, SDPD utilized a training video to train its officers annually on the vehicle pursuit policy adopted by the SDPD. The training video used during the 2016 training period, which was the training period cycle prior to the incident at issue in this case, was 25 minutes 50 seconds in length. The video was produced by the SDPD and retained in MP4 format; the video was loaded onto the City's learning website for delivery to officers. On an annual basis, SDPD would issue a Department Order, through which it ordered each SDPD officer to watch the video and complete and sign an attestation form.

Beginning in 2016, SDPD officers were instructed to access the video by using their SuccessFactors account.[4] Supervisors were tasked with responsibility for ensuring that their officers watched the training video. The SuccessFactors program does not have the capacity to track the amount of time a person spends watching a training video that is loaded into the system in MP4 format. The program is able to track the amount of time that each officer is logged into the system prior to clicking a button on the screen that indicates that the officer has viewed the content of the video (the "I agree" button).

Evidence demonstrated that the protocol in place between 2014 or 2015 and the four to five years after that was that a "supervisor would play the videos for [a group of] subordinates on the computer screen," and there was a "big screen" available for use to watch training videos. There was also some evidence that, at times, an officer might watch the video alone rather than in a group setting. The system would permit an officer to log into the system, click the "I agree" button, and watch the video after clicking on the button. Because of the manner in which the system recorded the time spent logged

---

4       SuccessFactors is the name of the City's learning management system.

into the system before clicking on the "I agree" button, if an officer clicked the button before watching the video, the system would record that the officer had spent only a few seconds "watching" the training video, even if the officer had, in fact, watched the entire video.

Shannah Oliveras, the Training Coordinator with the In-Service Training Unit of the SDPD, audited the training files of 1,829 sworn personnel employed by the SDPD; according to Oliveras, after subtracting out some of the files that Oliveras determined were inapplicable to the question at hand or files that were missing, she concluded that at least 89 percent of SDPD officers had complied with the attestation requirement in 2016.[5]

B. *Procedural background*

1. *Underlying proceedings*

Flores filed a wrongful death complaint in December 2017. Sanchez filed a complaint alleging a claim for negligence in March 2018. The trial court consolidated the two actions on May 23, 2018.

Approximately a year later, in May 2019, the City filed a motion for summary judgment, arguing that it was immune from liability under section 17004.7. The hearing was continued several times to permit appellants to complete additional discovery and also as a result of Covid-related restrictions. The trial court heard the matter on October 23, 2020, and issued

---

[5] Oliveras subtracted from the 1,829 officers those "recruits to the academy or [those] who graduated from the academy in February 2017 or sooner," as well as the 226 individuals for whom she was unable to find training files. According to Oliveras, her inability to locate a training file for an individual could have been the result of the individual having had a "name change[ ], [or] having retired or terminated their employment." Including the files that Oliveras was unable to locate would produce an attestation compliance rate of 77.73 percent.

a final ruling on the motion for summary judgment on November 12, 2020. The court entered judgment in favor of the City on December 9, 2020.

Appellants filed a timely notice of appeal.

## III.

## DISCUSSION

Appellants contend that the trial court erred in granting summary judgment because the City's promulgation of its vehicle pursuit policy and the training related to that policy did not comply with section 17004.7. We agree with one of appellants' contentions and conclude that the judgment must therefore be reversed.[6]

---

[6] On June 21, 2021, appellants filed a request that this court take judicial notice of the following four documents, which we identify by the titles provided by appellants: (1) "Proposed text of the amendment to California Code of Regulations, title 11, section 1081(22) ('CCR 1081'): https://post.ca.gov/Portals/0/post_docs/regulationnotices/2007/2 007-02ProposedLanguagePartI.pdf"; (2) "Notice of proposed regulatory action of the amendment to CCR 1081: https://post.ca.gov/Portals/0/post_docs/regulationnotices/2007/2 007-02.pdf"; (3) "Initial statement of reasons for the amendment to CCR 1081:https://post.ca.gov/Portals/0/post_docs/regulationnotices/2007/2 007-02InitialStatementReasons.pdf"; (4) "POST's frequently asked questions Web page concerning, 'What are the minimum hours for [pursuit] training?' POST's answer to that questions is as follows: 'Commission Regulation 1081 states that the training has to be at least (1) hour in duration.': https://post.ca.gov/Vehicle-Pursuit-Guidelines-FAQs."

On October 20, 2021, the City filed a request that this court take judicial notice of the following four documents, which we identify by the titles provided by the City: (1) "City of San Diego and National City Boundary Map"; (2) "Defendant City of San Diego's Responses to Plaintiff Patricia Flores' Request for Production of Documents and Tangible Things (Set One)"; (3) "Defendant City of San Diego's Response to Requests for Admissions from Patricia Flores (Set Two)"; (4) "Defendant City of San Diego's Responses to Plaintiffs Patricia Flores and Angelica Sanchez's Requests for Production of Documents (Set Five)."

9

A.   *Legal standards pertaining to a motion for summary judgment*

Code of Civil Procedure section 437c, subdivision (c) provides that summary judgment is to be granted "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)

A defendant "moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)  A defendant may meet this burden either by showing that one or more elements of a cause of action cannot be established or by showing that there is a complete defense. (*Ibid.*; Code Civ. Proc., § 437c, subd. (p)(2).)  If the defendant's prima facie case is met, the burden shifts to the plaintiff to show the existence of a triable issue of material fact with respect to that cause of action or defense. (*Aguilar, supra*, 25 Cal.4th at p. 850; Code Civ. Proc., § 437c, subd. (p)(2).)  "[T]o meet that burden, the plaintiff '. . . shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . .' " (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476–477.)

" 'The purpose of a summary judgment proceeding is to permit a party to show that material factual claims arising from the pleadings need not be tried because they are not in dispute.' [Citation.] 'The function of the pleadings in a motion for summary judgment is to delimit the scope of the

---

We conclude that the documents for which judicial notice has been sought by the parties are not necessary to our determination of the issue that we ultimately conclude requires reversal of the trial court's judgment. We therefore deny both parties' requests for judicial notice as "unnecessary to resolution of the issues on appeal." (*Animal Legal Defense Fund v. LT Napa Partners LLC (*2015) 234 Cal.App.4th 1270, 1276, fn. 5.)

issues:  the function of the affidavits or declarations is to disclose whether there is any triable issue of fact within the issues delimited by the pleadings.' [Citations.]  The complaint measures the materiality of the facts tendered in a defendant's challenge to the plaintiff's cause of action.  [Citation.]" (*FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 381.)

In reviewing a grant of summary judgment, we conduct an independent review to determine whether there are triable issues of material fact and whether the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Aguilar, supra*, 25 Cal.4th at p. 843.)  We apply the same standards as the trial court—i.e., a defendant must show that at least one element of the plaintiff's cause of action cannot be established, or that there is a complete defense to the cause of action, and if such a showing is made, the burden then shifts to the plaintiff to show that there is a triable issue of material fact as to that issue.  (Code Civ. Proc., § 437c, subds. (o), (p)(2); see *Alex R. Thomas & Co. v. Mutual Service Casualty Ins. Co.* (2002) 98 Cal.App.4th 66, 72.)  We construe the moving party's evidence strictly, and the nonmoving party's evidence liberally, in determining whether there is a triable issue.  (*Alex R. Thomas*, at p. 72.)

B.  *The immunity authorized under section 17004.7*

"[Vehicle Code] section 17001 creates a statutory exception to public entities' general tort immunity:  'A public entity is liable for death or injury to person or property proximately caused by a negligent or wrongful act or omission in the operation of any motor vehicle by an employee of the public entity acting within the scope of his employment.'  'Section 17004.7 in turn limits the liability that [Vehicle Code] section 17001 otherwise permits by affording immunity to public agencies that adopt and implement appropriate vehicle pursuit policies.' " (*Ramirez, supra*, 5 Cal.5th at p. 999.)

11

Subdivision (a) of section 17004.7 clarifies that the immunity provided in this statute is in addition to other available potential immunity, and also indicates that an agency has discretion whether to adopt a vehicle pursuit policy that meets the requirements of section 17004.7:

> "The immunity provided by this section is in addition to any other immunity provided by law.  The adoption of a vehicle pursuit policy by a public agency pursuant to this section is discretionary."

Subdivision (b) of section 17004.7 sets forth the specific requirements that an agency must meet in order to be entitled to the immunity granted by the provision:

> "(1) A public agency employing peace officers that adopts and promulgates a written policy on, and provides regular and periodic training on an annual basis for, vehicular pursuits complying with subdivisions (c) and (d) is immune from liability for civil damages for personal injury to or death of any person or damage to property resulting from the collision of a vehicle being operated by an actual or suspected violator of the law who is being, has been, or believes he or she is being or has been, pursued in a motor vehicle by a peace officer employed by the public entity.

> "(2) Promulgation of the written policy under paragraph (1) shall include, but is not limited to, a requirement that all peace officers of the public agency certify in writing that they have received, read, and understand the policy.  The failure of an individual officer to sign a certification shall not be used to impose liability on an individual officer or a public entity."[7]

---

[7]     As the court in *Riley v. Alameda County Sheriff's Office* (2019) 43 Cal.App.5th 492 (*Riley*), explained, section 17004.7 was amended in 2005 in order to ensure that agency vehicle pursuit policies were not simply being adopted as mere formalities:

> "In 2005, section 17004.7 was amended to its current form, partially in response to a Court of Appeal decision that

12

Subdivision (c) of section 17004.7 contains "detailed requirements" for pursuit policies. (*Ramirez, supra*, 5 Cal.5th at p. 999, fn. 1.) The section specifies 12 "minimum standards" that "[a] policy for the safe conduct of motor vehicle pursuits by peace officers shall meet . . . ." (§ 17004.7, subd. (c).)[8]

observed that the statute granted 'a "get out of liability free card" to public entities that go through the formality of adopting such a policy. There is no requirement the public entity implement the policy through training or other means. Simply adopting the policy is sufficient under the current state of the law.' (*Nguyen v. City of Westminster* (2002) 103 Cal.App.4th 1161, 1168, 127 Cal.Rptr.2d 388 (*Nguyen*); see also *Ramirez, supra*, 5 Cal.5th at pp. 999–1000, 236 Cal.Rptr.3d 374, 422 P.3d 1022; Stats. 2005, ch. 485, § 11, pp. 3825–3827 (2005-2006 Reg. Sess.); Sen. Com. on Judiciary, Analysis of Sen. Bill No. 719 (2005–2006 Reg. Sess.) as amended May 5, 2005, at p. 7 [discussing *Nguyen*]; Sen. Com. on Pub. Safety, Analysis of Sen. Bill No. 719 (2005–2006 Reg. Sess.) as amended Apr. 21, 2005, at p. M [same].) In *Ramirez*, at page 1000, 236 Cal.Rptr.3d 374, 422 P.3d 1022, the California Supreme Court observed that '[t]he current section 17004.7 does contain requirements that the public entity implement the policy through training and other means to ensure it is not a mere formality.' The 2005 amendments also substantially expanded the list of minimum standards in Section 17004.7, subdivision (c). (Stats. 2005, ch. 485, § 11, pp. 3825–3827.)" (*Riley*, at pp. 501–502.)

[8] " 'The requirement of adoption of a written policy [that] complies with section 17004.7, subdivision (c) obviously was intended to provide entity control over the pursuing officers during a pursuit. [Citation.] The requirement of entity control, we believe, in turn was intended to reduce the number and frequency of unreasonably dangerous pursuits and the resulting accidents.' " (*Riley, supra*, 43 Cal.App.5th at p. 501, quoting *Payne v. City of Perris* (1993) 12 Cal. App.4th 1738, 1747.)

13

Of particular importance with respect to the issues raised in this appeal, subdivision (d) of section 17004.7 defines what is meant by the phrase "regular and periodic training" as used in subdivision (b). Subdivision (d) provides that "regular and periodic training" means "annual training that shall include, at a minimum, coverage of each of the subjects and elements set forth in subdivision (c) *and that shall comply, at a minimum, with the training guidelines established pursuant to Section 13519.8 of the Penal Code*." (§ 17004.7, subd. (d), italics added.)

Subdivision (e) of section 17004.7 expresses the Legislature's determination that while any vehicle pursuit policy adopted by an agency must, at a minimum, meet the standards set out in subdivision (c), a vehicle pursuit policy may go further in restricting or limiting vehicle pursuits:

> "(e) The requirements of subdivision (c) represent minimum policy standards and do not limit an agency from adopting additional policy requirements. The requirements in subdivision (c) are consistent with the 1995 California Law Enforcement Vehicle Pursuit Guidelines developed by the Commission on Peace Officer Standards and Training

---

Among the "minimum standards" that a policy must meet are that the policy "[d]etermine under what circumstances to initiate a pursuit," including "defin[ing] a 'pursuit,' articulat[ing] the reasons for which a pursuit is authorized, and identify[ing] the issues that should be considered in reaching the decision to pursue," and that the policy "should also address the importance of protecting the public and balancing the known or reasonably suspected offense, and the apparent need for immediate capture against the risks to peace officers, innocent motorists, and others to protect to public." (§ 17004.7, subd. (c)(1).) Another standard that a policy must meet is that it "[d]etermine when to terminate or discontinue a pursuit," including considering "[f]actors" such as "[o]ngoing evaluation of risk to the public or pursuing peace officer," "[t]he protection of the public . . . ," "[v]ehicular or pedestrian traffic safety and volume," "[w]eather conditions," "[t]raffic conditions," "speeds," "[a]vailability of air support," and "[p]rocedures when an offender is identified and may be apprehended at a later time or when the location of the pursuit vehicle is no longer known." (§ 17004.7, subd. (c)(9).)

14

pursuant to Section 13519.8 of the Penal Code that will assist agencies in the development of their pursuit policies. Nothing in this section precludes the adoption of a policy that limits or restricts pursuits."[9]

Finally, subdivision (f) of section 17004.7 clarifies that the determination as to whether an agency has complied with subdivisions (c) and (d) of the statute are questions for a court to determine, as a matter of law.

C. *Additional relevant statutory and regulatory provisions*

As noted, subdivision (d) of section 17004.7 specifically references the "training guidelines established pursuant to Section 13519.8 of the Penal Code."

Penal Code section 13519.8 comprises multiple subdivisions; its overall effect is to grant authority to the POST Commission with respect to setting standards pertaining to the state-wide training of officers "in the handling of high-speed vehicle pursuits."[10]

---

[9] Notably, this subdivision specifically refers to the POST Commission's guidelines with respect to vehicle pursuits, adopted pursuant to the authority granted by the Legislature in Penal Code section 13519.8—the statutory provision that is referenced in subdivision (d)'s discussion of the requirements for the annual training of officers with respect to an agency's adopted vehicle pursuit policy. We will further discuss both the POST Commission's guidelines, and Penal Code section 13519.8, in part III.C.3, *post*.

[10] Penal Code section 13519.8 was initially enacted in 1993. (See Stats. 1993, ch. 340, § 1.) As adopted at that time, Penal Code section 13519.8 included language requiring the POST Commission to "implement, on or before November 1, 1994, a course or courses of instruction for the training of law enforcement officers in the handling of high-speed vehicle pursuits and . . . also develop uniform, minimum guidelines for adoption by California law enforcement agencies for response to high-speed vehicle pursuits." The

15

Penal Code section 13519.8 provides in full:

> "(a)(1) The commission[11] shall implement a course or courses of instruction for the regular and periodic training of law enforcement officers in the handling of high-speed vehicle pursuits and shall also develop uniform, minimum guidelines for adoption and promulgation by California law enforcement agencies for response to high-speed vehicle pursuits. The guidelines and course of instruction shall stress the importance of vehicle safety and protecting the public at all times, include a regular assessment of law enforcement's vehicle pursuit policies, practices, and training, and recognize the need to balance the known offense and the need for immediate capture against the risks to officers and other citizens of a high-speed pursuit. These guidelines shall be a resource for each agency executive to use in the creation of a specific pursuit policy that the agency is encouraged to adopt and promulgate, and that reflects the needs of the agency, the jurisdiction it serves, and the law.
>
> "(2) As used in this section, 'law enforcement officer' includes any peace officer of a local police or sheriff's department or the California Highway Patrol, or of any other law enforcement agency authorized by law to conduct vehicular pursuits.

---

statute required that such training be included in the basic training for officers, but also required that officers who had already completed basic training participate in "supplementary training" with respect to "high-speed vehicle pursuits, as prescribed and certified by the commission." (See former Pen. Code, § 13519.8, subds. (b), (c).) In 2005, the same year section 17004.7 was amended, Penal Code section 13519.8 was amended to its current form (see Stats. 2005, ch. 485, § 4).

11  The "commission" referred to in Penal Code section 13519.8, subdivision (a)(1) is the POST Commission. (See *Ramirez, supra*, 5 Cal.5th at p. 999, fn. 1.)

"(b) The course or courses of basic training for law enforcement officers and the guidelines shall include adequate consideration of each of the following subjects:

"(1) When to initiate a pursuit.

"(2) The number of involved law enforcement units permitted.

"(3) Responsibilities of primary and secondary law enforcement units.

"(4) Driving tactics.

"(5) Helicopter assistance.

"(6) Communications.

"(7) Capture of suspects.

"(8) Termination of a pursuit.

"(9) Supervisory responsibilities.

"(10) Blocking, ramming, boxing, and roadblock procedures.

"(11) Speed limits.

"(12) Interjurisdictional considerations.

"(13) Conditions of the vehicle, driver, roadway, weather, and traffic.

"(14) Hazards to uninvolved bystanders or motorists.

"(15) Reporting and postpursuit analysis.

"(c)(1) All law enforcement officers who have received their basic training before January 1, 1995, shall participate in

17

supplementary training on high-speed vehicle pursuits, as prescribed and certified by the commission.

"(2) Law enforcement agencies are encouraged to include, as part of their advanced officer training program, periodic updates and training on high-speed vehicle pursuit. The commission shall assist where possible.

"(d)(1) The course or courses of instruction, *the learning and performance objectives, the standards for the training, and the guidelines shall be developed by the commission* in consultation with appropriate groups and individuals having an interest and expertise in the field of high-speed vehicle pursuits. The groups and individuals shall include, but not be limited to, law enforcement agencies, police academy instructors, subject matter experts, and members of the public.

"(2) The commission, in consultation with these groups and individuals, shall review existing training programs to determine the ways in which high-speed pursuit training may be included as part of ongoing programs.

"(e) It is the intent of the Legislature that each law enforcement agency adopt, promulgate, and require regular and periodic training consistent with an agency's specific pursuit policy that, at a minimum, complies with the guidelines developed under subdivisions (a) and (b)." (Italics added.)

In implementing a variety of legislative mandates with respect to the training of California peace officers, the POST Commission has adopted regulations.[12] Relevant to the issues raised on appeal is Regulation 1081, which provides in its introduction the following:

_____

[12] "[The] POST [Commission] is a state-funded organization designed to insure professional standards in law enforcement. Penal Code section 13500 et seq. describes POST's role in setting standards and guidelines pertinent to

18

"(a) Legislatively mandated courses, as specified in Commission Regulation 1005(f), pertain to training mandated by the Legislature for various kinds of peace officers and other groups *for which the Commission has responsibility to establish minimum standards*. The Commission may approve legislatively mandated courses that can be completed in fewer than the minimum hours. In such cases, the courses must be competency-based, where each student demonstrates mastery of clearly specified learning outcomes. Legislatively mandated courses shall meet the following minimum content and hours. Commission Regulations 1052-1056, and 1059 specify the requirements for certification and presentation of these courses.

"Credit for legislatively mandated courses that can be completed in fewer hours when using technology-based delivery (i.e., interactive multimedia) will be the same number of hours credited for a traditional instructor-led

---

the selection and training of peace officers." (*Diffey v. Riverside County Sheriff's Department* (2000) 84 Cal.App.4th 1031, 1034, disapproved on other grounds in *Colmenares v. Braemar Country Club, Inc.* (2003) 29 Cal.4th 1019, 1031, fn. 6.) The Legislature has delegated a number of "powers" to the POST Commission; among the powers granted to the POST Commission are the following: (1) "To develop and implement programs to increase the effectiveness of law enforcement and when those programs involve training and education courses to cooperate with and secure the cooperation of state-level peace officers, agencies, and bodies having jurisdiction over systems of public higher education in continuing the development of college-level training and education programs" (Pen. Code, §13503, subd. (e)), and (2) "To do any and all things necessary or convenient to enable it fully and adequately to perform its duties and to exercise the power granted to it" (*id.*, subd. (i)).

Penal Code section 13506 authorizes the POST Commission to "adopt those regulations as are necessary to carry out the purposes of this chapter."

course. Testing is required to demonstrate competency." (Cal. Code Regs., tit. 11, § 1081, italics added.)[13]

Regulation 1081 sets out a list of more than 45 different training subjects as to which the POST Commission has been tasked with providing training standards and guidelines by the Legislature. Among those training subjects is "High-Speed Vehicle Pursuit Training." With respect to this training subject, Regulation 1081 provides[14]:

> "High-Speed Vehicle Pursuit Training 1 Hour Minimum Annually. [Penal Code section 13519.8(a)-(e)]
>
> "For all peace officers of an agency authorized by law to conduct vehicle pursuits.
>
> "(1) Vehicle Safety, Operation and Tactics
>
> "(2) Agency Vehicle Pursuit Policy
>
> "(3) Assessing Risk, Dangers, and Conditions
>
> > "(A) Public safety
> >
> > "(B) Officer safety

---

[13] There is no indication that there have been any changes to Regulation 1081 with respect to its treatment of vehicle pursuit training since the time period at issue.

[14] Examples of the some of the subjects that Regulation 1081 discusses are "Child Abuse Investigation," "Developmental Disabilities and Mental Illness," "Electronic Surveillance," "Human Trafficking Training," "Radar Operator Course." None of the subjects are numbered or otherwise designated in subdivisions. Each training subject includes the general subject matter heading, as well as the number of hours designated for that particular training, the authorizing statute related to that subject matter, and, typically, a number of topics that are to be covered in the training on that subject matter. (See Cal. Code Regs., tit. 11, § 1081.)

20

"(C) Importance of balancing the known offense and need for apprehension against the risks to officers and the public

"(4) Consideration of Law Enforcement Vehicle Pursuit Issues

"(A) When to initiate a pursuit

"(B) The number of involved law enforcement units permitted

"(C) Responsibilities of primary and secondary law enforcement units

"(D) Driving tactics

"(E) Helicopter assistance

"(F) Communications

"(G) Capture of suspects

"(H) Termination of a pursuit

"(I) Supervisory responsibilities

"(J) Blocking, ramming, boxing and roadblock procedures

"(K) Speed limits

"(L) Interjurisdictional considerations

"(M) Conditions of the vehicle, driver, roadway, weather and traffic

"(N) Hazards to uninvolved bystanders or motorists

"(O) Reporting and post-pursuit analysis

"When used in conjunction with an agency's pursuit policy, the California Law Enforcement Vehicle Pursuit Guidelines (Rev. 2/2007) and/or Pursuit Driving Update (2007) telecourse DVD can be used to satisfy this requirement. Note: POST videos typically require 2-5 training hours.)"

D. *The City is not entitled to summary judgment based on its defense of full immunity under section 17004.7*

In support of its motion for summary judgment, the City asserted that it was entitled to full immunity from liability related to the vehicle pursuit of William Flores on March 26, 2017, on the ground that it met all of the requirements of section 17004.7. The trial court agreed with the City and determined that, as a matter of law, the City complied with all three requirements of section 17004.7 (i.e., (1) the *adoption* of a policy that complies with subdivisions (b)(1) and (c) of the statute, (2) the *promulgation* of the policy in compliance with subdivisions (b)(1) and (b)(2), and (3) the *training* of officers on the policy, in compliance with subdivisions (b)(1) and (d)), and that the City is therefore immune from liability for any injuries or deaths that resulted from a real or perceived vehicle pursuit.[15]

---

[15] In part, the trial court reached its conclusion that the City had demonstrated that it met the training requirement for a vehicle pursuit policy under section 17004.7 because, the court determined, there is no minimum time standard applied to the training required for immunity under section 17004.7. In reaching this conclusion, the trial court relied in part on the ground that the language of section 17004.7 itself does not include a time requirement for the annual training, and in part on the ground that Regulation 1081 includes a title referring to " 'Legislatively Mandated Courses,' " but the Legislature did not "mandate" the annual training for vehicle pursuit policies, and instead required such training "only if the police agency desires to take advantage of immunity."

Appellants challenge the trial court's conclusions that the City met the final two of the three requirements set out in section 17004.7—i.e., that that the City sufficiently promulgated its vehicle pursuit policy and adequately trained its officers on the policy, as required by section 17004.7.[16] With respect to the City's training of its police force on its vehicle pursuit policy during the year prior to the incident at issue, appellants contend that the trial court erred in concluding that the City was not required to provide a minimum of one hour of training per year on its vehicle pursuit policy, in compliance with the minimum time standard set out in Regulation 1081.

According to appellants, Regulation 1081 requires that any training on a vehicle pursuit policy must be an hour in duration, which is the amount of time that the POST Commission determined is necessary to permit adequate

[16] Appellants do not challenge the first prong of the requirements of section 17004.7, i.e., that the vehicle pursuit policy adopted by the City, which the City refers to as "San Diego Police Department Procedure 1.03," meets the standards for a vehicle pursuit policy required under section 17004.7, subdivision (c).

However, appellants do separately argue that the City failed to meet a so-called "fourth prong" for immunity under section 17004.7. Appellants argue that in *Ramirez, supra*, 5 Cal.5th at page 1002, the Supreme Court "establishes a fourth prong, i.e., fourth question to ask, when considering a public agency's compliance with [section] 17004.7," which, appellants contend, is whether an agency has "meaningfully implemented its pursuit policy vis-à-vis promulgation (prong 2) and training (prong 3)." Although we question the premise of appellants' contention that the Supreme Court, in effect, added an additional legal requirement to the statutory immunity set out in section 17004.7, we need not address or even consider this question, or the other challenges raised by appellants, because, as we explain in the text, we agree that the City has not established that it met the "training" requirement prong of section 17004.7, as a matter of law.

23

coverage of the topics and elements that every compliant vehicle pursuit policy must cover.[17]

The City makes three arguments in response to appellants' contention that the trial court erred in failing to conclude that the minimum one hour per year time requirement for vehicle pursuit training set forth in Regulation 1081 applies for purposes of the training required in order for an agency to be entitled to immunity under section 17004.7. The City first argues that Regulation 1081 pertains only to basic training provided at law enforcement academies, and that it does not apply to *annual* training such as that contemplated under section 17004.7. Second, the City asserts, in an argument comprising a single sentence, that Regulation 1081 applies only to training that is *mandated* by the Legislature, and the training provided with respect to the immunity granted in section 17004.7 is "discretionary," not mandatory. Finally, the City argues that even if vehicle pursuit training is considered to be "mandated" by the Legislature, the one-hour time requirement imposed by Regulation 1081 goes beyond the legislative mandate granted to the POST Commission by the authorizing statute (PC 13519.8) and therefore constitutes an ultra vires act. Notably, the City does

---

[17] Appellants note that Regulation 1081 provides for only a single potential exception to the minimum time requirements set out for each subject matter training identified, and that is where the training at issue incorporates testing that permits the training entity to determine the officer's competency with respect to the subject matter of the training, as described in subdivision (a) of Regulation 1081. Regulation 1081, subdivision (a) provides that "[t]he [POST] Commission may approve legislatively mandated courses that can be completed in fewer than the minimum hours. In such cases, the courses *must be competency-based, where each student demonstrates mastery of clearly specified learning outcomes.*" (Italics added.) In the absence of such competency-based training, however, the "minimum content and hours" set out in Regulation 1081 apply.

not argue that the evidence it presented on summary judgment demonstrated, as a matter of law, that the City's training during the relevant period prior to the incident at issue met the requirement set out in Regulation 1081 that vehicle pursuit training be a minimum of one hour per year.

1.  *Relevant rules of statutory and regulatory interpretation*

The City's arguments regarding the meaning and effect of the relevant statutes, as well as Regulation 1081, require that we interpret these provisions.

Our goal in construing a statute is to " ' "ascertain the intent of the Legislature so as to effectuate the purpose of the law." ' [Citations.] 'In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose.' [Citation.] At the same time, 'we do not consider . . . statutory language in isolation.' [Citation.] Instead, we 'examine the entire substance of the statute in order to determine the scope and purpose of the provision, construing its words in context and harmonizing its various parts.' [Citation.] Moreover, we ' "read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' " ' " (*State Farm Mutual Automobile Ins. Co. v. Garamendi* (2004) 32 Cal.4th 1029, 1043.)

"If the statutory language is clear and unambiguous, then we need go no further. [Citation.] If, however, the language is susceptible to more than one reasonable interpretation, then we look to 'extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the

statutory scheme of which the statute is a part.' " (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519.)

"The rules governing interpretation of statutes generally apply also to initiatives and regulations." (*Spanish Speaking Citizens' Foundation, Inc. v. Low* (2000) 85 Cal.App.4th 1179, 1214.)

2. *The City's first and second arguments misperceive the mechanism by which Regulation 1081 is applicable for purposes of determining section 17004.7 immunity*

The City's first argument as to why Regulation 1081 does not apply to require a minimum of one hour of annual training for purposes of section 17004.7 immunity is that Regulation 1081, which sets out minimum training standards "for legislatively *mandated* courses, which are specified in [Regulation 1005, subdivision (f)]," applies only to "*entry level training* [*that*] *is* mandated by statute." The City asserts, "[Regulation 1005, subdivision (f)] clearly pertains to *entry level training* . . . – this is the content for a basic law enforcement academy for cadets, not content for annual pursuit training under CVC 17004.7."

This contention is clearly incorrect. Regulation 1005 is titled "Minimum Standards for Training," and its provisions set out the general standards for a variety of types of peace officer training. A review of the provisions of Regulation 1005 demonstrates that the basic training course plan (referred to as "Minimum Entry-Level Training Standards") is provided for in *subdivision (a)* of Regulation 1005. The remaining subdivisions of Regulation 1005, including subdivision (f), provide outlines for *other* types of training that may be required of a peace officer in the State of California. For example, subdivision (b) of Regulation 1005 outlines the training required for peace officer supervisors. Subdivision (c) of Regulation 1005 outlines the training required for those seeking management level positions. Subdivision

26

(d) of Regulation 1005 references "Continuous Professional Training (CPT)" that is required of officers every 2 years, and subdivision (e) of the same regulation references the training required for "department heads and their executive staff positions."

Subdivision (f) of Regulation 1005 states, in full: "Specific training mandated by the legislature is specified in Regulation 1081." Thus, contrary to the City's description of the purpose of subdivision (f) of Regulation 1005 (and therefore, also of Regulation 1081), it is clear that subdivision (f) does not relate solely to basic training for new cadets. The City's contention in this regard therefore does not provide a basis for concluding that the minimum training standards set forth in Regulation 1081, including the minimum time standard, do not apply to the training required for purposes of immunity under section 17004.7.

We similarly reject the City's suggestion that Regulation 1081 has no application with respect to vehicle pursuit training because, as the City asserts, Regulation 1081 does not apply to "discretionary training such as the annual pursuit training, which is *optional* if the entity wishes to avail itself of the immunity." According to the City's argument, Regulation 1081 applies only to "mandated" training, and because section 17004.7's requirements are "discretionary," in the sense that the Legislature has allowed agencies to decide whether to meet the requirements of section 17004.7 in order to be entitled to immunity, the provisions of section 17004.7 cannot be considered to be "mandated," rendering Regulation 1081 inapplicable.

This analysis fails to appreciate how section 17004.7 operates. Although section 17004.7 does not require that every agency that employs peace officers adopt and promulgate a vehicle pursuit policy and train its officers with respect to that policy, section 17004.7 makes it clear that if an

27

agency wants to obtain the benefit of immunity under the statute, that agency *must meet the requirements* imposed by section 17004.7. Only "[a] public agency employing peace officers *that adopts and promulgates a written policy on, and provides regular and periodic training on an annual basis for, vehicular pursuits* complying with subdivisions (c) and (d) *is immune from liability* for civil damages . . . ." (§ 17004.7, subd. (b)(1), italics added.) Thus, if an agency wants the benefit of immunity from liability for civil damages arising from a real or perceived vehicle pursuit under section 17004.7, then the Legislature has *mandated* the three things that agency must do in order to be entitled to that immunity. One of those three requirements is that the agency "provide[ ] regular and periodic training on an annual basis" with respect to its section 17004.7-compliant vehicle pursuit policy. Thus, section 17004.7 does, in fact, *mandate* vehicle pursuit training for those agencies desiring the benefit of section 17004.7 immunity. Such training is, therefore, legislatively mandated where section 17004.7's immunity is invoked.

Further, section 17004.7 specifically imposes two additional requirements pertaining to the training: First, the training must cover all of the subjects and elements set forth in subdivision (c) of section 17004.7,[18] and second, the training "shall comply" with any "training guidelines established pursuant to" Penal Code section 13519.8.[19] Penal Code section

---

[18] " 'Regular and periodic training' [for purposes of section 17004.7 immunity] means annual training that *shall include*, at a minimum, *coverage of each of the subjects and elements set forth in subdivision (c)* . . . ." (§ 17004.7, subd. (d), italics added.)

[19] " 'Regular and periodic training' [for purposes of section 17004.7 immunity] means annual training . . . that *shall comply, at a minimum, with the training guidelines established pursuant to Section 13519.8 of the Penal Code*." (§ 17004.7, subd. (d), italics added.)

13519.8, in turn, authorizes the POST Commission to develop guidelines for the creation of vehicle pursuit polices, as well as standards and objectives for vehicle pursuit training regarding those policies; the POST Commission's regulations regarding the creation of the vehicle pursuit policies and the training on those policies, therefore, are "established pursuant to" Penal Code section 13519.8.

Although section 17004.7, subdivision (d) refers to the need for compliance with "the training *guidelines* established pursuant to [Penal Code] Section 13519.8" (italics added) we are satisfied that the Legislature's use of the word "guidelines" in this provision is intended to relate to the training "standards" referred to in Penal Code section 13519.8, subdivision (d); in other words, the Legislature has used the terms "guidelines" and "standards" interchangeably in the statutory scheme related to vehicle pursuit policies.[20] In addition to the fact that these words are synonyms and have definitions that overlap conceptually, the structure of the statutes at issue convinces us that the Legislature intended to refer to the same concepts

---

[20] "Standard" is a synonym for "guideline" (see Merriam-Webster Dict. Online (2022) <https://www.merriam-webster.com/thesaurus/guideline> [as of Sept. 15, 2022], archived at <https://perma.cc/5SW3-BJWS> and some definitions of a "guideline" overlap with those of a "standard" (compare Oxford English Dict. Online (2022) "guideline" <https://www.oed.com/view/Entry/89823771?redirectedFrom=guideline#eid> [as of Sept. 15, 2022], archived at <https://perma.cc/A3B6-YLQH> ["b. A rule, principle, or general statement which may be regarded as a guide to procedure, policy, interpretation, etc., or (especially) as giving authoritative guidance. In later use often in plural: a set of such rules, statements, etc." (italics added)] with Oxford English Dict. Online (2022), "standard" <https://www.oed.com/viewdictionaryentry/Entry/188962> [as of Sept. 15, 2022], archived at <https://perma.cc/9PCP-DPNV> ["17. a. A rule, principle, criterion, or measure by which something can be judged or evaluated. In later use also: an accepted norm against which something can be compared. Now frequently in plural"].)

when using these terms in the relevant statutes, in that the Legislature intended to use these two words to refer to criteria that must be met in order for an agency to qualify for immunity under section 17004.7.

Notably, the phrase "training guidelines," which is what is used in section 17004.7, is not found in Penal Code section 13519.8.  Nor does Penal Code section 13519.8 use the words "guideline" or "guidelines" in connection with the *training-related* provisions of that statute; instead it uses the word "guidelines" with respect to something else.  In subdivision (a)(1) of Penal Code section 13519.8, the Legislature has mandated that the POST Commission complete two separate but related undertakings:  First, the POST Commission "shall *implement a course or courses of instruction for* the regular and periodic *training*" on vehicle pursuits (i.e., the training mandate), and second, the POST Commission " shall . . . develop uniform, minimum *guidelines for adoption and promulgation*" of the policies the state is encouraging agencies to "adopt and promulgate" (i.e., the policy-guideline mandate).  (Pen. Code, § 13519.8, subd. (a)(1).)[21]  A review of the statute

---

[21]    We quote here the language of relevant portions of Penal Code section 13519.8, but with editorial additions that highlight the two different mandates to the POST Commission set for the in the statute and further emphasize the distinction in the language used with respect to these two mandates:

> "(a)(1) The commission[ ] [1] *shall implement a course or courses of instruction for the regular and periodic training* of law enforcement officers in the handling of high-speed vehicle pursuits and [2] *shall also develop uniform, minimum guidelines for adoption and promulgation* by California law enforcement agencies for response to high-speed vehicle pursuits.  The [2] guidelines [for adoption and promulgation by California law enforcement agencies for response to high-speed vehicle pursuits] and [1] course of instruction [for the regular and periodic training of law

enforcement officers] shall stress the importance of vehicle safety and protecting the public at all times, include a regular assessment of law enforcement's vehicle pursuit policies, practices, and training, and recognize the need to balance the known offense and the need for immediate capture against the risks to officers and other citizens of a high-speed pursuit.  These [2] guidelines [for adoption and promulgation by California law enforcement agencies for response to high-speed vehicle pursuits] shall be a resource for each agency executive to use in the creation of a specific pursuit policy that the agency is encouraged to adopt and promulgate, and that reflects the needs of the agency, the jurisdiction it serves, and the law."  (Italics added.)

The final sentence of subdivision (a)(1) makes clear that the provision's use of the word "guidelines" refers to the specific subjects that are set forth in Regulation 1081 with respect to the vehicle pursuit policy itself—i.e., the subjects that must be addressed in a policy adopted and promulgated by an agency that seeks the benefit of immunity under section 17004.7.

Other provisions of Penal Code section 13519.8 similarly repeat the distinction between these two separate concepts—i.e., the training mandate and the policy-guideline mandate—and demonstrate that the reference to "guidelines" is made in connection with only the policy-guideline mandate. For example, subdivision (b) of Penal Code section 13519.8 states "The [1] course or courses of basic training for law enforcement officers and [2] the guidelines [for adoption and promulgation by California law enforcement agencies for response to high-speed vehicle pursuits] shall include adequate consideration of each of the following subjects," and proceeds to list 15 subjects, such as "[w]hen to initiate a pursuit" (*id.*, subd. (b)(1)) and "[i]nterjurisdictional considerations" (*id.*, subd. (b)(12)).  Similarly, subdivision (d)(1) of Penal Code section 13519.8 mentions both the training mandate and the policy-guideline mandate:  "The [1] course or courses of instruction, the learning and performance objectives, the standards for the training, and [2] the guidelines [for adoption and promulgation by California law enforcement agencies for response to high-speed vehicle pursuits] shall be developed by the commission in consultation with appropriate groups and individuals having an interest and expertise in the field of high-speed vehicle pursuits. . . ."  Significantly, subdivision (d)(1) of Penal Code section 13519.8 is the same subdivision in which the Legislature authorizes the POST Commission to "develop, in consultation with appropriate groups and

31

demonstrates that Penal Code section 13519.8 uses the word "guidelines" only in connection with the *policy-guideline* mandate, and not in connection with the *training* mandate. In addition, Regulation 1081 does not use the phrase "training guidelines" or the word "guidelines," but instead, references "standards."[22] Thus, there are no "training guidelines" referenced in Penal Code section 13519.8 or in Regulation 1081. The phrase "training guidelines" in section 17004.7 must therefore refer to the "standards" pertaining to training that are referenced in Penal Code section 13519.8 and Regulation 1081 because, if one were to conclude that "training guidelines" as used in section 17004.7 means something other than the training "standards" referred to in Penal Code section 13519.8, the result would be that there are *no* "training guidelines" with which an agency must comply under Penal Code

individuals," the "learning and performance objectives" and "standards for the training" that are to apply to vehicle pursuit trainings.

Finally, subdivision (e) of Penal Code section 13519.8 refers to the "guidelines" and states that those "guidelines" are mandatory with respect to the creation of a compliant vehicle pursuit *policy*: "It is the intent of the Legislature that each law enforcement agency adopt, promulgate, and require regular and periodic training consistent with an agency's specific pursuit policy that, at a minimum, complies with the guidelines developed under subdivisions (a) and (b)." Thus, under subdivision (e), it is the "agency's specific pursuit policy" that must comply with the "guidelines developed under subdivisions (a) and (b)."

The term "guidelines" is used consistently only in connection with Penal Code section 13519.8's references to the development of the vehicle pursuit policies, and is not used in connection with the statute's references to the training mandate.

[22] Regulation 1081 uses the word "standards" a single time, in the introductory paragraph, stating: "Legislatively mandated courses, as specified in Commission Regulation 1005(f), *pertain to training mandated by the Legislature* for various kinds of peace officers and other groups *for which the Commission has responsibility to establish minimum standards*." (Italics added.)

32

section 13519.8. Such an interpretation would render section 17004.7's directive to agencies that they must comply with the "training guidelines" established under Penal Code section 13519.8 a nullity; we must avoid such a construction. (See *Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1039 [" 'An interpretation that renders statutory language a nullity is obviously to be avoided' "]; see also *Reno v. Baird* (1998) 18 Cal.4th 640, 658 [" 'Courts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage' "].) We therefore conclude, instead, that, in requiring agencies to "*comply*, at a minimum, *with the training guidelines established pursuant to Section 13519.8*" (italics added) under section 17004.7, the Legislature intended to require agencies to comply with *any parameters or rules*—i.e., any *standards*— for vehicle pursuit training that are created pursuant to the authority of Penal Code section 13519.8.[23] Section 17004.7 therefore *requires compliance* with any vehicle pursuit training regulations

_____

[23] That the Legislature did not use the terms "guidelines" in section 17004.7 and "standards" in Penal Code section 13519.8 to refer to two different levels of obligation for adherence—but rather, used both words to refer to criteria or rules that are mandatory—is further supported by the manner in which Penal Code section 13519.8 uses the word "guidelines" in connection with the policy-guideline mandate. Specifically, although Penal Code section 13519.8 refers to the rules that the POST Commission is required to develop with respect to providing content parameters for the policies to be created by agencies by referring to them as "guidelines," it is clear that an agency *must* consider and address each of the subjects set out in its "guidelines" in order for the policies to be created. (See Pen. Code, § 13519.8, subd. (e) ["an agency's specific pursuit policy" must "at a minimum, compl[y] with the guidelines developed under subdivisions (a) and (b)" of Penal Code section 13519.8].) Thus, a policy's compliance with the "guidelines" is mandatory, such that the policy-related "guidelines" are not mere recommendations, but are rules with which adherence is required.

33

established by the POST Commission pursuant to the mandate established by Penal Code section 13519.8.[24]

It is the language of section 17004.7, itself, that renders mandatory an agency's compliance with the regulations established pursuant to the authority granted to the POST Commission pursuant to Penal Code section 13519.8. The City's second argument as to why Regulation 1081's one-hour training requirement does not apply to training for purposes of section 17004.7 immunity is therefore without merit.

3. *The City is incorrect in its assertion that the POST Commission is not authorized to set time standards with respect to the training that it is authorized to oversee and that its act in setting a minimum time standard is void*

The City's third and final contention as to why the minimum time standard set out in Regulation 1081 should not apply to the City's annual training on its vehicle pursuit policy under section 17004.7 is that, to the extent the POST Commission was authorized to set standards applicable to

_____

[24] A review of the amendments to section 17004.7 and Penal Code section 13519.8 demonstrates that some of the imprecision in the use of various terminology among these provisions, and even within Penal Code section 13519.8 itself, such as the retention of its reference to "basic training," has arisen as a result of the continuing evolution of the Legislature's approach to encouraging agencies to adopt and effectively implement vehicle pursuit policies that address all of the subjects identified by the Legislature and the POST Commission as necessary to ensure public safety in connection with vehicle pursuits. We believe that our interpretation of the relevant provisions best harmonizes the statutory provisions and regulation, consistent with the stated legislative purpose of encouraging local agencies to adopt, promulgate and train on vehicle pursuit policies in order to "improve public safety" (*Ramirez, supra*, 5 Cal.5th at p. 1001).

annual vehicle training, the POST Commission acted beyond the scope of this authority in setting a minimum *time* standard for such training.[25]

In determining the validity of a regulation promulgated by a state agency, we consider whether the regulation is " '*consistent and not in conflict with*' " the statutory provision that authorizes it and whether the regulation is reasonably necessary to effectuate the purpose of the authorizing law. (*Morris v. Williams* (1967) 67 Cal.2d 733, 748 (*Morris*), quoting Gov. Code, former § 11374[26].) A court's task in this regard has been described as " ' "decid[ing] whether the [agency] reasonably interpreted the legislative mandate." [Citation.]' " (*Woods v. Superior Court* (1981) 28 Cal.3d 668, 679 (*Woods*).) In doing so, a court "presume[s] the validity of the regulation," and the "burden lies with the party challenging the regulation to show its invalidity." (*In re Mohammad* (2022) 12 Cal.5th 518, 529.)

When the question being scrutinized is whether an agency's action in promulgating a regulation was authorized by the Legislature, as it is here, very little deference is accorded the agency's interpretation of the statute: "A court *does not . . . defer to an agency's view when deciding whether a regulation lies within the scope of the authority delegated by the Legislature.*

---

25 The City argues that "[n]either CVC 17004.7 nor PC 13519.8 created a mandatory minimum time for [the] training or required that all agencies use the training created by POST."

26 Former section 11374 of the Government Code was renumbered as section 11342.2 (Stats. 1979, ch. 567, §§ 1–2.) Government Code section 11342.2 provides: "Whenever by the express or implied terms of any statute a state agency has authority to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, no regulation adopted is valid or effective unless consistent and not in conflict with the statute and reasonably necessary to effectuate the purpose of the statute."

The court, not the agency, has 'final responsibility for the interpretation of the law' under which the regulation was issued. [Citations.]" (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11, fn. 4, italics added.)

With these standards in mind, we consider whether the minimum time standard set out in Regulation 1081 for vehicle pursuit policy training, comes within the authority granted to the POST Commission. As the City notes, neither section 17004.7 nor Penal Code section 13519.8 includes an express authorization to the POST Committee regarding the setting of minimum time standards for training on vehicle pursuit policies. Nor do these provisions require that an agency utilize vehicle pursuit training created by the POST Commission for purposes of entitlement to section 17004.7 immunity, as the City also notes. Instead, it is clear that section 17004.7 envisions that each agency will create its own training, tailored to the specific vehicle pursuit policy adopted by that agency.[27] However, the fact that there is no express statement regarding the authority to set a minimum time standard or any requirement that local agencies use training created by the POST Commission, does not answer the question whether the POST Commission's promulgation of a minimum time standard in Regulation 1081 went beyond the authority granted to it by statute. Nor does it suggest that the statutory framework exempts agencies from meeting the standards for training promulgated by the POST Commission in Regulation 1081, including the minimum time standard, when creating and providing their own vehicle

---

[27]    Given that section 17004.7 permits an agency to develop and adopt its own unique vehicle pursuit policy (within the general parameters set forth in subdivision (c) of the provision), it makes sense that each agency also develops and provides training with respect to the specific policy that particular agency has adopted.

36

pursuit training. Rather, we must look to the language of the authorizing statute to determine the scope of authority granted to the POST Commission with respect to issues pertaining to vehicle pursuit training.

The statute authorizing the POST Commission to develop a regulation related to setting standards for training pertaining to vehicle pursuits is Penal Code section 13519.8.[28] As previously noted, that statute specifically tasks the POST Commission with two important assignments: first, the POST Commission "shall implement a course or courses of instruction for the regular and periodic training of law enforcement officers in the handling of high-speed vehicle pursuits," and second, it "shall . . . develop uniform, minimum guidelines for adoption and promulgation by California law enforcement agencies for response to high-speed vehicle pursuits." (Pen. Code, § 13519.8, subd. (a)(1).) With respect to the training of officers, subdivision (d)(1) of Penal Code section 13519.8 specifically further delegates to the POST Commission" the development of not only "[t]he course or courses of instruction," but also "*the learning and performance objectives*," and "*the standards for the training*," which the POST Commission is required to develop, along with the guidelines for the policies themselves, "in consultation with appropriate groups and individuals having an interest and

---

28      Again, section 17004.7 specifically references Penal Code section 13519.8 in its provision defining the "training" prong that an agency must meet in order to qualify for immunity under section 17004.7. (§ 17004.7, subd. (d) ["annual training . . . shall include, at a minimum, coverage of each of the subjects and elements set forth in subdivision (c) and . . . shall comply, at a minimum, with the training guidelines established pursuant to Section 13519.8 of the Penal Code"].) As is clear from Penal Code section 13519.8, any "training guidelines" that are "established" pursuant to that provision are established through the POST Commission; Penal Code section 13519.8 does not itself establish its own training guidelines or standards, but instead delegates this work to the POST Commission.

expertise in the field of high-speed vehicle pursuits." In other words, the Legislature has authorized the POST Commission to develop officer training courses and set out specific requirements—i.e., standards and objectives— that must be met with respect to this training.

After considering this statutory language, we conclude that the POST Commission " ' "reasonably interpreted [its] legislative mandate" ' " (*Woods, supra*, 28 Cal.3d at p. 679) when it included, among the training standards it set for vehicle pursuit training, a minimum time standard of one hour annually for the training. A reasonable interpretation of the phrasing of subdivision (d)(1) of Penal Code section 13519.8 is that the "standards" for a training may include a metric regarding the minimum amount of time that the training should comprise.[29] Given the number and breadth of the topics that are required to be covered with respect to vehicle pursuit training, the setting of a minimum time standard helps to ensure that the training will be meaningful and effective. Further, the setting of a minimum time standard is consistent with the POST Commission's obligation to develop "learning and performance objectives" and "standards for training," because the amount of time devoted to training directly impacts the amount of content and detail that may be conveyed to an officer, and the imposition of a minimum time standard for the training does not conflict with anything in Penal Code

---

[29]     The term "standard" has been defined as "something set up and established by authority as a rule for the measure of quantity, weight, extent, value, or quality" (Merriam Webster Dict. Online (2022) <https://www.merriam-webster.com/dictionary/standard> [as of Sept. 15, 2022], archived at<https://perma.cc/LB35-4KA2> as well as "[a] rule, principle, criterion, or measure by which something can be judged or evaluated" (Oxford English Dict. Online (2022) <https://www.oed.com/viewdictionaryentry/Entry/188962> [as of Sept. 15, 2022], archived at <https://perma.cc/GXD2-SSPL>.

section 13519.8.  (See *Morris, supra*, 67 Cal.2d at p. 748 [regulation must be consistent and not conflict with authorizing statute].)

Our conclusion that the POST Commission's decision to include a minimum time standard with respect to vehicle pursuit training in Regulation 1081 falls within the authority granted to the POST Commission through Penal Code section 13519.8 is also supported by the fact that *every one of the wide variety of training subjects* addressed in Regulation 1081includes a minimum time standard in connection with that training subject.  These minimum time standards exist even though, as to the vast majority of the training subjects, there is legislative silence on the matter of minimum time standards.[30]  We have found no case authority declaring—or even suggesting—that the POST Commission has exceeded its authority in

---

[30]    This court has identified four training subjects addressed in Regulation 1081 for which the Legislature, in the authorizing statute, has specifically mandated certain time periods for the training at issue.  (See Pen. Code, § 13519.14 [authorizing development of training and guidelines for dealing with complaints of human trafficking, and including requirement that the training be at least two hours in length]; Pen. Code, § 13515.27 [establishing the creation of a continuing education course on "interaction with persons with mental illness, intellectual disability, and substance use disorders," and providing that the course will be "at least three consecutive hours"]; Pen. Code, § 13515.28, subd. (a)(1) [mandating that the POST Commission "require the field training officers who provide instruction in the field training program to have at least eight hours of crisis intervention behavioral health training to better train new peace officers on how to effectively interact with persons with mental illness or intellectual disability"]; Veh. Code, § 40802 [requiring that arresting officers who use radar have "successfully completed a radar operator course of not less than 24 hours on the use of police traffic radar," plus an additional two-hour training course if the "laser or . . . other electronic device is used to measure the speed of moving objects"].)  However, this leaves at least 42 other training subjects addressed in Regulation 1081 for which the authorizing statutes make no mention of a legislatively-determined time requirement for training.

39

setting any of the minimum time standards for any of the subjects that the POST Commission addresses in Regulation 1081 as to which the Legislature has neither specifically mentioned a required minimum time standard nor expressly stated that the POST Commission is to determine the minimum time standard.

The City's contention that the POST Commission acted outside its authority in setting a one-hour annual minimum training requirement for vehicle pursuit training is therefore without merit. Section 17004.7 itself requires that an agency that adopts its own vehicle pursuit policy train its officers with respect to that policy in a manner that *also complies with the training dictates of Penal Code section 13519.8*, which, in turn, requires compliance with the dictates of the POST Commission's standards for that training. As we have determined, the POST Commission acted within the authority granted to it in Penal Code section 13519.8 in setting a minimum time standard for vehicle pursuit training. Therefore, the one-hour annual minimum time standard set out in Regulation 1081 applies to agencies seeking immunity pursuant to section 17004.7.[31]

---

[31] The parties dispute the relevance and admissibility of a portion of a declaration of Steven D'Arcy, an expert retained by the City for purposes of this litigation, which Mr. D'Arcy provided in a different case. Specifically, in support of appellants' position that the City's training was required to meet the one-hour annual minimum time standard set out in Regulation 1081 but failed to do so, appellants contend that in a different case, Mr. D'Arcy declared that immunity under section 17004.7 "requires at least one hour of annual pursuit training." The City contends that its objection to the admissibility of Mr. D'Arcy's declaration in a separate case was sustained and that ruling was not appealed by appellants. The City is correct that Mr. D'Arcy's declaration in a separate case is not evidence in this case because the trial court sustained its objection to the declaration. Although appellants assert that the trial court overruled the City's objection to Mr. D'Arcy's declaration and admitted the declaration in its entirety, the

40

Given our conclusion that the one-hour annual minimum time standard applies to the training provided by any agency seeking immunity under section 17004.7, the City must present undisputed facts demonstrating that its vehicle pursuit policy training was at least one hour in duration in the training year prior to the incident in order to be entitled to immunity under section 17004.7.[32] The undisputed facts do not support such a conclusion, as the City apparently concedes, given that it does not contend that summary judgment in its favor may be affirmed because the evidence demonstrates, as a matter of law, that its training met the one-hour minimum time standard set out in Regulation 1081. Rather, the record on summary judgment

---

record demonstrates that appellants are incorrect. Appellants rely on the numbering of the City's objections to suggest that the trial court did not sustain the City's objection number 36, which is true. However, the trial court's order identified the items to which it was sustaining objections by their *exhibit numbers*, not by the City's *objection numbers*. The trial court sustained an objection to Exhibit 22, which contains Mr. D'Arcy's declaration.

In any event, we would not have considered Mr. D'Arcy's declaration because it is irrelevant to our determination as to the proper interpretation of the statutes and the regulation at issue in this case. (See *Issakhani v. Shadow Glen Homeowners Assn., Inc.* (2021) 63 Cal.App.5th 917, 934 ["the meaning and purpose of a legislative enactment is a question of law for the court; an expert's opinion on such matters is an inadmissible legal conclusion"].)

[32] In *Ramirez, supra*, 5 Cal.5th at pages 999–1002, the Supreme Court quoted from the appellate court's factual description of the case and concluded that the appellate court had properly determined that total compliance with the certification requirement was not necessary. As quoted by the Supreme Court, the appellate court considered the number of officers who had completed the annual training on the agency's pursuit policy and had certified that they had received, read, and understood the policy "within a year of the incident" (*id.* at p. 998),t suggesting that the year prior to an incident is the relevant time period for purposes of determining an agency's eligibility for immunity under section 17004.7.

suggests that the City's training was less than an hour in duration. In response to multiple factual assertions set out in "Plaintiffs' Additional Material Facts and Evidence" in which the plaintiffs include the fact that the training video used by the City during the relevant time period was "25 minutes and 50 seconds," the City at no point disputed the description of the duration of the video. A copy of the 25 minute, 50 second training video was also included as an exhibit in the trial court. Further, the City offered no evidence that its vehicle pursuit policy training included anything *beyond* the mere screening of the 25 minute, 50 second video.

In the absence of evidence to support a determination, as a matter, of law, that the City's vehicle pursuit training met the one-hour annual minimum standard set out in Regulation 1081, the City cannot demonstrate that it met the "annual training" prong of section 17004.7. The City thus failed to demonstrate that it was entitled to the immunity granted in section 17004.7, and the trial court therefore should not have granted the City's motion for summary judgment.

## IV.

## DISPOSITION

The judgment entered in favor of the City is reversed. The matter is remanded to the trial court for further proceedings. Appellants are entitled to costs on appeal.


AARON, J.

WE CONCUR:

HALLER, Acting P. J.

DATO, J.


42